Case number 12-5334 at L. Rhonda N. Baird, Appellant v. Joshua Gotbaum, Director of Pension Benefit Guarantee Corporation. Ms. Baird for the Appellant, Ms. Lyons for the Appellate. Ms. Baird, good morning. Good morning, Your Honors. May it please the Court, I reserve two minutes for rebuttal. In the first five years of my employment at the Pension Benefit Guarantee Corporation, I had a productive work environment, positive reputation, and strong performance ratings. That's reflected in the record through testimony of my colleagues and supervisor at page 113. That all changed in 2002 when I testified on behalf of the union in an EEO action brought against the agency in April of 2002. And then in October of 2002, filed my first EEO complaint against the agency. Six weeks after filing that complaint, my acting supervisor, John Kuliga, subjected me to a very traumatic experience, physical confrontation, verbal abuse, threatening language, escalating what was a difference of opinion between the two of us. When I reported that to the general counsel, I was surprised by the stare and the smirk and further devastated by the delay to investigate at all and then the failure to adequately investigate that serious incident. That's the beginning of the hostile work environment. That's what I allege. In my complaint, I allege that the general counsel, deputy general counsel, herds, their subordinates and agents began a pattern of  And when I complained, failing to employ the agency's investigative power and police power to correct the actions, in retaliation for my testimony and my participation in the EEO process, the general counsel and deputy general counsel are vested with significant institutional authority that includes the agency's police power and use that authority to sanction things such as not just the Kuliga incident, but attorneys and agents in the Office of the General Counsel and the Human Resources Department that they work closely with. Physical confrontations, intimidation, such as Moreno in the Human Resources Department pounding the table while they abused me. Attorney Schwartz in the general counsel's office, a subordinate of deputy general counsel Hurst and the general counsel, not only committing the same acts of intimidating with pounding the table and abusing, but expanding it to use language from the district court judge Hovell to allege that she had called me a cancer publicly in front of persons that I have to work with on a routine basis. In the record at page 72 is what Judge Hovell said. She never called me a cancer. But that's the agency's act of ginning up the workplace in an attempt to change my reputation and to penalize me for the temerity to participate in the EEO process. The record has additional evidence, deputy general counsel Hurst and his grunts and snorts literally making me so uncomfortable I go to the EEO office and bear to paragraph 36 to complain and to beg for help when the general counsel wouldn't provide any. And the general counsel's response is, well, tell her to stop her suit and I'll talk to the staff. That's not the only evidence. Some additional examples is disseminating defamatory e-mails. People like Jeffress, who heard and understood the agency's actions towards me in the arbitration over the Pulido incident, disseminating e-mails over the agency's system, calling, referring to me as psychotic and having no corrective action when I report. Attorney Ray Forster, who represented the agency in the arbitration of the Pulido incident, disseminating an e-mail with deputy general counsel Hurst on it, referring to me as experiencing litigation-induced hallucinations, an e-mail that's distributed to the entire general counsel staff. One of the things that causes me a great deal of concern then and now is basis allegations of ethical misconduct made by Attorney Schwartz. You can't file that motion without approval from the hierarchy, including deputy general counsel Hurst. At the same time that I learned from the agency that they have subjected the only other attorney who dares to help employees with EEO actions to ethical conduct violation before the D.C. bar. And here I'm faced with the agency beginning the process with me. I don't think I slept for weeks after that motion was filed. That and so many other actions form the basis of my complaint. Not just the acts that were perpetrated by persons under the authority of the general counsel, deputy general counsel, and human resources staff, but also their failure to investigate and to take corrective action. Counsel, in what the parties are calling Baird 1, we quoted Morgan for the requisite linking between episodes that are claimed to create part of a hostile environment, same type of employment actions, frequency, perpetration by the same managers. And I didn't see much of an effort in your brief to try to pull together all the alleged episodes in terms of those criteria. Well, what you quoted, Your Honor, is what Morgan says is if, for example, what Morgan made clear is there's no specific criteria. It is truly looking at the environment and what's happening in the environment. And my complaints, both of them allege that this was action that was perpetrated, initiated by the general counsel and human resources staff. I say that repeatedly. But first place, general counsel staff covers the multitude. It's an understatement. You try to sort of focus it on the people at the top for failure to investigate adequately and remedy problems. But that surely can't make it because if you have a whole – I mean, that would turn every totally scattered set of episodes with a different perpetrator for each one of them across the agency. That would turn all of those into a hostile work environment. That can't be. It's available to everybody. Except for one fact in this case that's critical, Your Honor. And that is what the complaint shows, fomenting the workplace. There's evidence of, for example, Moreno meeting someone at lunch and saying, oh, why are you associating with her? I'm investigating her. Schwartz in front of me saying, overthrow her. She gives us nothing in EEO context. The general counsel saying, well, tell her to stop suing and then I'll tell people to stop. There's fomenting that's happening in the workplace. This is not disconnected, Your Honor. I get all the reasonable inferences drawn from the facts of allegations in the complaint. And when you have evidence that's in this case of persons who have been found, for example, as violating my rights under Title VII, Latimer, Hurst, Resnick, taking action. For example, Latimer, through his subordinate, making false allegations to my supervisor. Not just one subordinate. Latimer goes from representing the agency in the case I testified in in 2002 to being responsible for the investigation of the polygamy incident in the Human Resources Department. And then into the pension area where I work. And each sub, you see his subordinates acting. And it's reasonable to infer from the complaints, Your Honor, that they're acting because of the agency's actions. The agency allowed allegations like litigation-induced hallucinations to be disseminated. Your Honor, painting a picture of someone... You're talking about, in effect, a duty on the part of the agency to monitor everything that's going on and to start a proceeding, I guess, whenever it hears that somebody feels that something has happened that could be an element of a hostile environment claim. Which can reach pretty low in terms of triviality where it's standing alone. Your Honor, two things about that. One, you've already said in your first decision, the rules of the agency are benefits of employment that are subject to Title VII. Yeah, but we also said that didn't make any difference in the case. In discrimination and in retaliation claims. That in a hostile work environment, Wayne Brooks versus Grundleman, you recently said, you aggregate the acts. I think Burlington Northern is instructive for this. You don't look to the underlying act. When the claim of retaliation is made, you look to the act itself. And here, the failure to investigate flows from the agency's rules that you've already determined provide an obligation. The agency said in Taylor versus Sowell is that when you use the complaint procedure, they have an obligation to investigate. Probably the best evidence of them not complying with that obligation is the acts continue. They continue to today. So it's not necessarily whether or not each individual act would maintain a claim. It's a hostile work environment claim that you recently said, Your Honor, is aggregated for the purposes of examining the hostile work environment to determine whether or not there's an unlawful employment practice. The acts are looked at, and what I allege is if you have these powerful officials encouraging and fomenting with direct evidence of the retaliatory animals, that is relevant. The fact that they're sophisticated and knowledgeable about Title VII is also relevant. Harris makes it clear and Morgan makes it clear they're not exhaustive lists. In fact, in the concurring opinion in Harris, Justice Scalia bemoaned the fact that the court could not fashion anything more concrete. And it's a matter of looking in my situation at the disparity between the way I'm treated versus the way other complaints are treated. It's an issue of not just the underlying act, but looking at the totality of the circumstances, which is something neither court did in their decisions. What's really going on in my environment? When the general counsel refuses to act when he has an affirmative obligation to act, and we have evidence that they've already been found to have violated their rights and obligations to conduct an objective and partial investigation into my complaint, those are relevant facts that support the claim that these acts are not so sophisticated to escape the review of Title VII. They are relevant. They are part of the unlawful employment practice. And on the second point, Joanne, I see I'm out of time, but if I could just address the second point. Under Harris, you determine the severity by looking at someone in my situation. The psychological harm is real. The effect to my reputation in the workplace is real. The agency allowed these litigation-induced hallucinations and psychotics to continue unabated because they took no action to address that and correct it. And if the court has no other questions, I yield. All right. We'll give you a minute and reply. Ms. Lyons?  Good morning. May it please the Court. The allegations of occasional discord in Ms. Baird's workplace fall beneath the threshold for a retaliatory house-to-work environment, primarily because the things about which she complains are fairly ordinary tribulations for an attorney involved in union activities, intra-union political disputes, and as a person who frequently represents employees in administrative litigation against the agency, as well as performing her duties as an ERISA and bankruptcy attorney. In short, the context of this workplace matters a great deal. Because the incidents alleged here were not abusive and they were collectively not intimidating, insulting, or ridiculing and with a sufficient nexus to her protected activity, dismissal is appropriate here. Ultimately, the totality of the allegations consists mainly of lapses in professionalism or discourteous behavior typically arising in conflict-laden situations among, let's be honest, lawyers with maybe Type A personalities. And they fail to satisfy the objective standard for severity and pervasiveness. And one place I'd like to start in terms of responding is this notion of what workplace hostility we're talking about. The only things that the proper focus should be on is Ms. Baird's working environment, not the entire working environment at PBGC. In other words, if somebody sends an e-mail to somebody else that Ms. Baird is not a recipient on and never sees, Title VII wouldn't reach a disparaging comment about her performance or her, it wouldn't create, it wouldn't contribute to a hostile work environment for her. And that's the key. It's a hostile work environment for her. The kinds of things that she's talked about today with the one e-mail. Well, wait a minute. Why wouldn't it? Even if she doesn't see it and I get an e-mail from a co-worker that makes some snide remark about someone else and I'm thinking, you know, that could happen to me if I complain about this or if I do such and such. So the fact that she doesn't see it, I don't see if it's, we're looking at, you know, would it dissuade a reasonable person. Then I think what we're talking about is what impact that e-mail might have on your working environment. And the key here is to define the working environment and the allegations and then you have to look for a nexus of their connectedness and then whether they're severe and pervasive. And a single isolated remark, I would submit, can rarely, if ever, except if it's, as we know from one case in this, the Fannie Mae case, one word in the workplace is absolutely forbidden. But we have cases like Baylock and Brooks where we've got supervisors yelling at co-workers and engaging in various, you know, e-mail correspondence, flinging a heavy notebook at an employee and doing things that are more directly related to the employee's employment. And even those kinds of things have all been held by the court to fall beneath the level of Title VII. What we have here is a fairly classic case of Title VII or Ms. Baird trying to use the agency's civility code to create Title VII liability and that's something the Supreme Court has said is inappropriate for the very reasons that the court has talked about this morning, which is it becomes, it gives rise to a hostile work environment where every time somebody looks at somebody funny in the morning or doesn't say good morning or says good morning to one employee but not to another. There's a threshold here of severity and pervasiveness that is simply absent in this case. With regard to the specific incidents of an attorney during a deposition, for example, on a break, becoming frustrated and pounding a table, this court is familiar with the litigation scene. That is in the context not particularly physically intimidating if the table separates you and there's nothing else described nor other allegations that create a situation that you can envision as intimidating, ridiculing, or insulting because there are no words offered. With regard to the polygate incident, which is where Ms. Baird began this morning back in 2002, I would note that Ms. Baird filed a lawsuit arising out of that incident in 2003 and she voluntarily dismissed it with prejudice. So I'm not saying it can't be considered at all, but it can't, it can't, it isn't logically connected to any of the events here. It's also fairly remote in time. The allegations considered by the district court here between 2005 and 2009, none of them involved Mr. Polyga again. Did the judge who involved tell that that was precluded? Judge Chevelle... I believe Judge Chevelle did not consider that to be an untimely event. I think because the case had been dismissed. Judge Chevelle had handled the 2003 litigation. She was familiar with it. And after the agency moved for summary judgment, Ms. Baird voluntarily dismissed it with prejudice. So I believe she did not consider it on that basis. It's also, even if that's not the reason, it's not connected logically to any of these other incidents. It's separated in time. They're completely different people. And there is no other incident alleged that's as physically intimidating. The polygate incident is somewhat different because it's in a confined space in her office. She doesn't appear to have an easy means of escape. And it seems that Mr. Polyga took a step or two toward her. So it's a fundamentally different kind of thing. If there are no further questions, we would ask that the case be affirmed. All right. Thank you. Your Honor, the polygate incident explains why this court should independently remand each case. The district court applied res judicata. Judge Walton expressly judged Chevelle implicitly by determining that the polygate incident could not be a part of it because in footnote four she says, I'd already recovered, which isn't true, and that it was in prior litigation. That runs afoul of Morgan that says you can use earlier acts to prove the hostile work environment, if it's relevant, if it's sufficiently related. So there's an independent basis for reversal. More importantly, Harris and Morgan makes clear it is the totality of the circumstances that's determined. It's not whether or not the employer has a reasonable person would be dissuaded. Hostile work environment has a standard that requires you to determine whether or not the terms and conditions of my employment were impacted. And that's exactly what happened here. The rules, as the court said in your first decision, are employment benefits. It is clear the agency didn't comply with their obligation and that they treated my claim very differently from the complaints of other employees, including the employee in Taylor v. Solis and so many others that are included in the complaint. These are not ordinary tribulations of the workplace. There's no litigation exception. There's no exception, Your Honors, for actions that may have occurred because of the agency's determination to retaliate and to be sophisticated enough to do so in ways that may normally be ordinary tribulations. But in the context in which this has happened, attorneys can, in fact, are obligated under the agency's rules to comply with it. And I request that the court, in its deliberation, consider the totality of the circumstances in my case and remand both complaints to the district court. Thank you. Thank you.
judges: Henderson, Williams, Randolph